UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DOMINIQUE DEMONCHAUX,                              Civ. Act. No.:  10 CIV. 4491 (DAB)

                                    Plaintiff,

                                                              **DEFENDANT'S RULE
                -against-                                      56.1 STATEMENT**

UNITEDHEALTHCARE OXFORD AND
OXFORD HEALTH PLANS (NY), INC.,                   DOCUMENT
                                                  ELECTRONICALLY FILED
                                    Defendants.

-------------------------------------------------------------X

        Pursuant to Rule 56.1 of the Local Civil Rules For The Southern And Eastern Districts of New

York, Defendant, Oxford Health Plans (NY), Inc. ("Oxford") individually and s/h/a Unitedhealthcare

Oxford, by and through its attorneys, Sedgwick LLP, submits this Rule 56.1 Statement as to which there

are no genuine issues to be tried:

        **A.  Background**

        1.      Plaintiff Dominique Demonchaux ("Demonchaux") is currently 54 years-old.  (163).[1]

        2.      Effective January 1, 2006, Demonchaux was a participant in Oxford Health Plans (NY),

Inc., Freedom Plan Select (the "Plan), which is an employee welfare benefit plan governed by the

Employee Retirement Income and Security Act of 1974, 29 U.S.C. §1001, *et seq.* ("ERISA").  (041, 300).

---

[1] The numbers in parentheses refer to the Bates Stamped pages starting with the prefix
"DEMONCHAUX 000__", which are annexed to the following Declarations as indicated: the pages
Bates Stamped DEMONCHAUX 000001 through DEMONCHAUX 000165 are annexed to the
Declaration of Rodney Lippold dated August 31, 2011 ("Lippold Dec.") as **Exhibits "A" and "B"**; the
pages Bates Stamped DEMONCHAUX 000166 through DEMONCHAUX 000274 are annexed to the
Declaration of Shelly Lacroix dated August 26, 2011 ("Lacroix Dec.") as **Exhibit "C"**; and the pages
Bates Stamped DEMONCHAUX 000275 through DEMONCHAUX 000349 are annexed to the
Declaration of  Venice Scott dated September 1, 2011 ("Scott Dec.") as **Exhibit "D"**.  These
documents were reviewed by Mr. Lippold, Ms. Lacroix and Ms. Scott and they have declared that the
respective documents, Bates stamped DEMONCHAUX 000001 through DEMONCHAUX 000349,
are true and correct copies of the applicable group Certificate of Insurance, proof of Demonchaux's
continuation of enrollment in Oxford's Group Health Plan Coverage through COBRA, and the claim
and appeal files for Demonchaux's claim for inpatient benefits, which encompass the administrative
record for this claim. (*See* Lippold Dec., ¶¶3-4; Lacroix Dec., ¶3; and Scott Dec., ¶3).

3.      Effective July 1, 2009, Demonchaux remained covered under the Plan through COBRA after a reduction in work hours on June 30, 2009.  (245).

### B.  Pertinent LTD Plan Provisions

4.      The Plan covers "diagnosis and treatment of Biologically, Based Mental Illnesses for adults," which includes treatment for major depression, bulimia and anorexia on an inpatient, partial hospitalization or outpatient basis.  (097).

5.      The Plan does not cover services that are "not Medically Necessary."  (072).  The Plan further states that:

> If there is a dispute between a Network Provider and Us about the Medical Necessity of a service or supply, you or your Network Physician may appeal Our decision.  Any disputed service or supply will not be Covered during the appeal process.  (*Id.*).

6.      The Plan defines "Medically Necessary" as follows:

> **Medically Necessary:** Services or supplies as provided by a Hospital, Skilled Nursing Facility, Physician or other provider required to identify or treat your illness or injury and which, as determined by Our Medical Director, are:
>
> 1.  Consistent with the symptoms or diagnosis and treatment of your condition;
> 2.  Appropriate with regard to standards of good medical practice;
> 3.  Not solely for your convenience or that of any provider; and
> 4.  The most appropriate supply or level of service which can safely be provided.   For inpatient services, it further means that your condition cannot safely be diagnosed or treated on an outpatient basis.  (086).

7.      The Plan also provides that

> All services are subject to review by Us to determine the Medical Necessity of proposed services, services currently being provided, or services already provided.  Denials will be made by the appropriate clinical personnel.  (028).

8.      With respect to notification that current services for a Member in an ongoing course of treatment are not Medically Necessary, the Plan provides as follows:

**How will I be notified of Oxford's determination?**

…

In the event that We render an Adverse Determination without attempting to discuss the matter with the Provider who specifically recommended the Health Care Service, procedure or treatment under review, the Provider will have the opportunity to request a reconsideration of the Adverse Determination. Except in cases of retrospective reviews, the reconsideration will occur within **one business day** of receipt of the request and will be conducted by your Provider and the Clinical Peer Reviewer making the initial determination or a designated Clinical Peer Reviewer if the original Clinical Peer Reviewer is not available. In the event that the Adverse Determination is upheld after reconsideration, We will provide notice as outlined in this section. Nothing in this section will preclude you from initiating an Appeal of an Adverse Determination. (029).

9.      The Plan explains the "Expedited Review Procedure" as follows:

Occasionally, medical circumstances require that certain procedures be performed without significant delay. When the time frames of the normal Grievance and Appeals process would **significantly increase the risk to the Member's health**, the Grievance Review Board will, upon your request for an Expedited Review, respond verbally to Complaints, Grievances and Appeals within **48** hours. A written verification of the Board's decision will follow within **three** business days of its decision. (075).

10.    The Plan defines "We, Our, or Us" as "Oxford Health Plans (NY), Inc." (087).

11.    The Plan also grants full discretionary authority to Oxford, stating:

**Discretionary Authority of Plan Administrator and Other Plan Fiduciaries**

In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious. (041).

### C.  Demonchaux's Claim for Inpatient Benefits Under the Plan

#### 1)  Oxford Certifies Demonchaux's Inpatient Treatment From June 29, 2009 through August 9, 2009 As Medically Necessary

12.     On June 29, 2009, Demonchaux was admitted to Monte Nido Vista Treatment Center in Agoura, California (the "Center") for treatment of anorexia nervosa.  (199, 177).

13.     Upon admission to the Center, Demonchaux reported that she was very stressed due to her boyfriend losing his job; having passive suicidal ideations with no plan or intent; binging and purging 4-6 times a day and engaging in self-harm.  (183).

14.     Demonchaux weighed 96 pounds upon admission, which was 76% of her ideal body weight.  (183).

15.     Demonchaux's attending physician at the Center was Dr. Gary Schneider and the contact person was Norah Wynne.  (183).

16.     The Center's initial treatment plan was to stabilize Demonchaux's mood, develop an eating plan and observe her for two (2) hours after meals and snacks, monitor her vitals, have her sign a behavioral contract not to cut herself, develop coping skills, cognitive behavioral therapy/dialectical behavior therapy ("CBT/DBT treatment"), perform medical and psychiatric evaluations and undergo medical laboratory work.  (183).

17.     The Center estimated that Demonchaux's length of treatment would be 6-8 weeks. (183).

18.     On June 29, 2009, Oxford verbally approved the Center's inpatient treatment of Demonchaux.  (178).

19.     The Center provided inpatient treatment to Demonchaux from June 29, 2009 to July 1, 2009 and charged Oxford $3,975.00, of which Oxford covered and paid the contractually agreed upon amount of $2,722.00, and Demonchaux was responsible for a $500.00 co-payment as required under the Plan.  (199, 206-09 *and see* 007).

20.     On July 2, 2009, Ms. Wynne reported to Oxford that Demonchaux had a history of parental physical and emotional abuse and that she had a stressful family relationship.  (184).

21.     Ms. Wynne also reported that Demonchaux was on constant observation during waking hours at the Center because she was binging, purging and cutting herself with scissors on her forearms to cope with her rage and anger.  (184).

22.     Ms. Wynne further reported that as of July 2, 2009, Demonchaux weighed 96 pounds and was on a "re-feeding program" to reach her initial goal of gaining 10 pounds.  (184).

23.     On July 6, 2009, Oxford notified Ms. Wynne that Dr. Satwant Ahluwali, an Oxford Medical Director, requested a peer-to-peer review of Demonchaux's case.  (184).

24.     On July 7, 2009, Dr. Ahluwalia performed a medical record review of Demonchaux's case and discussed Demonchaux's treatment with Dr. Schneider.  (184).

25.     During the call, Dr. Schneider reported to Dr. Ahluwalia that Demonchaux weighted 98.2 pounds and that she remained on close monitoring for self-harm, especially because of her weight gain.  (184).

26.     Dr. Ahluwalia certified Demonchaux's inpatient treatment at the Center as medically necessary through July 12, 2009.  (178, 184, 195).

27.     Dr. Ahluwalia also noted that a re-review of her case would be performed on July 13, 2009.  (184).

28.     The Center provided continued inpatient treatment to Demonchaux from July 2, 2009 to July 10, 2009 and billed Oxford $11,925.00, of which Oxford covered $9,666.00, which was the contractually agreed upon amount with the facility.  (201, 214-17).

29.     When Oxford paid for Demonchaux's inpatient treatment at the Center from July 2, 2009 to July 10, 2009, it informed the Center that Demonchaux was not responsible for any payment beyond the applicable co-payment, which had already been paid by Demonchaux.  (214 *and see* 206).

30.     The Center continued to provide inpatient treatment to Demonchaux from July 11, 2009 to July 17, 2009 and billed Oxford $9,275.00, of which Oxford paid $7,518.00, which was the contractually agreed upon amount with the facility.  (200, 210-13).

31.     On July 13, 2009, Ms. Wynne reported to Oxford that Demonchaux weighed 100.4 pounds and was eating 100% of her meals totaling 1,900-2,200 calories per day; Demonchaux complained that she was severely bloated and had a hard and distended stomach.  (184).

32.     Ms. Wynne also reported that Demonchaux reported having a strong desire to purge, but that she was trying not to and had no incidents of purging or self-harm.  (184).

33.     Ms. Wynne further stated that Demonchaux was following directions and had mentioned attempting to trust the staff at the Center.  (184).

34.     According to Ms. Wynne, as of July 13, 2009, Demonchaux had a distorted image of herself, tried isolating herself, but felt better having support, verbalized her feelings and recognized the connection between her history of abuse and her eating disorder.  (184).

35.     Ms. Wynne advised Oxford that Demonchaux continued to be on observation due to her urges of self-harm, but she had started to "self portion" that week.  (184).

36.     Ms. Wynne requested authorization for an additional 2-3 weeks of inpatient residential treatment.  (184).

37.     On July 13, 2009, Dr. Ahluwalia performed a medical record review of Demonchaux's case and noted that she continued to meet inpatient criteria and that the Center's treatment was appropriate for her presentation.  (184).

38.     On July 13, 2009, Dr. Ahluwalia approved Demonchaux's inpatient treatment at the Center through July 19, 2009.  (184).

39.     The Center continued to provide inpatient treatment to Demonchaux from July 18, 2009 to July 28, 2009 and billed Oxford $14,575.00, of which Oxford paid $11,814.00, which was the contractually agreed upon amount with the facility.  (202, 218-21).

40.     On July 21, 2009, Jeff Kelly from the Center advised Oxford that Demonchaux weighed 102 pounds and was compliant with eating 1,900-2,200 calories per day.  (185).

41.     Mr. Kelly also advised Oxford that Demonchaux constantly thought about and had difficulty refraining from purging; Demonchaux remained on constant observation after meals.  (185).

42.     Mr. Kelly also reported that Demonchaux had disclosed a history of sexual abuse (rape and molestation).  (185).

43.     On July 21, 2009, Dr. Ahluwalia performed a medical record review of Demonchaux's case and certified the Center's inpatient treatment through July 26, 2009.  (185).

44.     On July 21, 2009, Dr. Ahluwalia also noted that Demonchaux was improving and that the Center should be informed that her case would be reviewed for "step-down" to an outpatient treatment setting.  (185).

45.     On July 27, 2009, Mr. Kelly reported to Oxford that Demonchaux weighted 105.4 pounds and was eating 2,200-2,500 calories per day.  (185).

46.     Mr. Kelly also stated that Demonchaux appeared to become more "dimorphic" as she gained weight – specifically, he noted that she felt her legs were too fat, showered in the dark, attempted to scrape her skin off and had thoughts of cutting off her skin.  (185).

47.     Mr. Kelly further mentioned that the Center suspected that Demonchaux was purging and she was on observation for one (1) hour after meals.  (185).

48.     Mr. Kelly stated that he felt that if Demonchaux stepped down to an unsupervised setting in the evening that she would start purging again.  (185).

49.     Mr. Kelly also reported that Demonchaux planned to return to Connecticut after another 2-3 weeks of treatment.  (185).

50.     On July 27, 2009, Dr. Ahluwalia certified Demonchaux's inpatient treatment at the Center.  (185).

51.     The Center continued to provide inpatient treatment to Demonchaux from July 29, 2009 to August 7, 2009 and billed Oxford $10,740.00, which was covered in full by Oxford at the contracted rate.  (204, 230-33).

52.     On August 3, 2009, Oxford requested a peer-to-peer review of Demonchaux's case with Dr. Ahluwalia and the Center.  (185).

53.     On August 3, 2009, Dr. Ahluwalia performed a medical record review of Demonchaux's case and spoke with Dr. Schneider, who reported that she was having problems due to pancreatitis. (185).

54.     Dr. Schneider also reported that a gastrointestinal ("GI") consultation had been ordered and that Demonchaux had gained an additional pound.  (185).

55.     Dr. Ahluwalia informed Dr. Schneider that Demonchaux's inpatient treatment was medical necessary and certified her inpatient treatment up to August 6, 2009.  (185, 196).

56.     Dr. Ahluwalia also informed Dr. Schneider that the GI consultation had to be completed by August 6, 2009.  (185).

57.     The Center continued to provide inpatient treatment to Demonchaux from August 8, 2009 to August 9, 2009 and billed Oxford $2,148.00, which was covered in full by Oxford.  (205, 230-33).

58.     On August 7, 2009, Oxford left a voicemail with Ms. Wynne requesting Demonchaux's updated medical status and discharge plan.  (185-86).

59.     Ms. Wynne returned Oxford's call on August 7, 2009 and advised that Demonchaux had been admitted to the Center for 40 days and weighed 108 pounds; Ms. Wynne noted that Demonchaux had gained three (3) pounds in three (3) weeks and had maintained eating 2,200-2,500 calories per day. (186).

60.     Ms. Wynne also reported that Demonchaux complained of abdominal pain after eating and had urges to binge and purge to rid herself of her anxiety, helplessness and depressed mood. (186).

61.     In addition, Ms. Wynne reported that CT scans of Demonchaux's abdomen and pancreas were normal and that the GI consultation had been performed by Dr. Schiffman. (186).

62.     Ms. Wynne also stated that Demonchaux was concerned about maintaining her weight with fewer restrictions and that Demonchaux informed the staff that she would throw her food away if unsupervised. (186).

63.     In response, Oxford referred Demonchaux's case to Dr. Ahluwalia for a medical record review. (186).

64.     On August 7, 2009, Dr. Ahluwalia certified Demonchaux's inpatient treatment at the Center through August 9, 2009 and noted that her case would be sent for a peer review on August 10, 2009. (186).

65.     On August 7, 2009, a peer-to-peer review of Demonchaux's case was scheduled with the Center for August 10, 2009 between 1:30 and 3:30 p.m. (186).

### 2)  Oxford Determines that Demonchaux's Inpatient Treatment Was No Longer Medically Necessary

66.     On August 10, 2009, Dr. Ahluwalia noted that the Center's physician had not called for the peer-to-peer review and that based on her prior medical record review, Demonchaux's inpatient treatment was certified for transition to an outpatient treatment setting. (186).

67.     Based on her medical record review, Dr. Ahluwalia opined that Demonchaux was not clearly presenting signs or symptoms that required 24-hour monitoring and that her ongoing treatment

needs could be addressed in an intensive outpatient program; therefore, Dr. Ahluwalia opined that further inpatient treatment at the Center was not medically necessary. (197).

68.     By letter dated August 10, 2009, Oxford advised Demonchaux that its Medical Director had reviewed and considered all the information in her file and her request for continuing inpatient benefits was denied as of August 10, 2009 as not medically necessary. (292-298).

69.     Oxford's letter explained to Demonchaux that she was "not clearly presenting signs and symptoms that require 24 hour structure and monitoring" and that her "ongoing treatment needs can be addressed in [an] intensive outpatient level of care." (292).

70.     Oxford's letter further advised Demonchaux that its denial of coverage applied to all days going forward, unless clinical information was submitted that showed her need for continued inpatient treatment. (292).

71.     Oxford's August 10, 2009 letter enclosed explanations of member and provider appeal rights. (294-98).

72.     With respect to a provider's right to seek reconsideration of an adverse medical necessity determination, Oxford's letter stated the following:

> "In the event that Oxford renders an adverse medical necessity determination on a preservice or concurrent basis without first attempting to discuss the decision with the Member's provider who specifically recommended the health care service, the provider will have the opportunity to request a reconsideration of the adverse determination.  Except in cases of retrospective reviews, the reconsideration will take place within one business day of receipt of the request and will be conducted by the Oxford Medical Director, or the designated Medical Director if the original Medical Director is unavailable, who rendered the initial determination.  In the event that the adverse determination is upheld after reconsideration, Oxford will issue another adverse determination letter." (297).

73.     On August 12, 2009, Mr. Kelly contacted Oxford via telephone to discuss the denial of Demonchaux's inpatient treatment for want of medical necessity. (186).

74.     Mr. Kelly stated that the Center had been under the assumption that Dr. Ahluwalia was going to call its physician for the peer-to-peer review; therefore, he wanted to know whether an expedited appeals process was necessary given that there was a "miscommunication."  (186).

75.     Oxford informed Mr. Kelly that the process had to go through the Appeals Department because a denial was issued.  (186).

76.     Oxford also provided Mr. Kelly with the number for the Appeals Department.  (186).

77.     On August 13, 2009, Dr. Ahluwalia stated that she had done a number of peer-to-peer reviews with the Center and the process was always the same – that Oxford requested the Center's physician to call for the peer-to-peer review.  (186).

78.     On August 13, 2009, Dr. Ahluwalia reviewed Demonchaux's case with Dr. Schneider.  (187).

79.     Dr. Schneider reported that Demonchaux scratched her arm when she went to her GI consultation and that she was put on safety watch and had no further episodes of cutting.  (187).

80.     Dr. Schneider further reported that Demonchaux's laboratory results still showed unspecified "abnormalities," but the levels had been decreasing since her admission; he also reported that her stomach pain was cleared by GI.  (187).

81.     Additionally Dr. Schneider reported that Demonchaux had problems with anxiety over food.  (187).

82.     According to Dr. Schneider, Demonchaux needed continued treatment at the Center, with possible passes to leave the Center starting the next week.  (187).

83.     Dr. Ahluwalia advised Dr. Schneider of the appeals process and noted that Demonchaux had not cut herself since the incident, her laboratory results had all improved, GI cleared that she had no pancreatitis and she had gained weight.  (187).

### D. Demonchaux's Expedited Appeal

84.     By letter dated August 13, 2009, the Center requested an expedited appeal of Oxford's adverse medical necessity determination for Demonchaux's inpatient treatment at the Center for bulimia nervosa from August 10, 2009 forward. (318-319).

85.     The Center's letter stated that an expedited appeal was requested because Demonchaux's medical and psychological status was not indicative of a readiness to step-down from inpatient treatment. (319).

86.     The Center's letter also noted that Dr. Schneider had given detailed medical and clinical information to Dr. Ahluwalia on August 13, 2009, but Dr. Ahluwalia had stated that she did not find that the medical information supported Demonchaux's further inpatient treatment at the Center. (319).

87.     The Center submitted the following information in support of Demonchaux's expedited appeal: (a) a psychiatric note dated August 12, 2009; (b) laboratory tests dated August 12, 2009; (c) the Center's weekly update dated August 13, 2009; (d) a client incident report dated August 7, 2009; (e) an outside treatment assessment form dated August 7, 2009; (f) findings of an August 4, 2009 CT scan of the pelvis; (g) vitals record from July/August 2009; (h) weight record as of August 10, 2009; (i) clinical progress notes; and (j) staff communication notes. (320-349).

### 1) <u>August 12, 2009 Psychiatric Note</u>

88.     On August 12, 2009, Demonchaux presented to Dr. W. Hamlin Emory for a neuropsychiatric follow-up. (320-21).

89.     Dr. Emory noted that Demonchaux admitted having disordered eating that manifested as daily binging and purging that developed when she was 17 years-old. (320).

90.     It was noted that the frequency of Demonchaux's purging depended on whether she was alone and that purging no longer relieved her anxiety as it once had. (320).

91.    The psychiatric note recorded that Demonchaux's lowest weight was 89 pounds and the most she ever weighed was 124 pounds (when she was 13 years-old).

92.    It was also noted that she engaged in self-injurious behavior ("SIB") by superficially cutting her arms with scissors.  (320).

93.    Demonchaux's past medical history was significant for peripheral neuropathy, pancreatitis and acid reflux.  (320).

94.    It was noted that her past psychiatric treatment included six (6) months of residential treatment in 1995 and six (6) weeks of treatment in 1987.  (320).

95.    It was also noted that Demonchaux had a history of sexual abuse – once by a hospital orderly and once by a stranger on a subway when she was between the ages of 17 and 20 years-old.  (320).

96.    Dr. Emory's medical findings included binge/purge, bradycardia, constipation, insomnia, headaches, superficial cutting and needing a two (2) hour walk to become calm.  (321).

97.    With respect to her clinical progress, it was noted that Demonchaux stated she felt an improvement in calm and mood with Diazepam.  (321).

98.    It was also noted that Demonchaux started taking Effexor on August 7, 2009 and "experienced two situations that included stress that day; she became angry, began visualizing graphic, violent images, and engaged in self injurious behavior – cut arms with staples; Effexor was [discontinued] and Diazepam was continued."  (321).

99.    Demonchaux was to follow-up with Dr. Emory in one (1) week and continue with nutritional rehabilitation.  (321).

### 2) August 12, 2009 Laboratory Test Results

100.    Laboratory tests conducted on August 12, 2009 showed that Demonchaux had high levels of glucose, AST/ALT ratio, amylase and lipase.  (322-23).

### 3)   The Center's Weekly Update Dated August 13, 2009

101.    The Center's weekly update dated August 13, 2009 showed that Demonchaux's weight had increased from 96.0 pounds when she was admitted on June 29, 2009 to 107.6 pounds as of August 10, 2009.  (324).

102.    It was also noted that Demonchaux had recently engaged in self-harm by cutting her left forearm with staples taken from Dr. Shiffman's office.  (325).

103.    Demonchaux was noted as being open and communicating with staff and peers and tolerating her meal plan with no adversity.  (325).

104.    The weekly update further noted that Demonchaux ate 2,500-2,800 calories per day. (324).

105.    The following psychological issues were identified:

    a)   Demonchaux reported episodes of increased anxiety, especially in the early morning (mild severity);

    b)   Demonchaux expressed disturbing body image issues; she body checked frequently and was ambivalent to her weight gain (moderate severity);

    c)   Demonchaux open and able to reach out for assistance when feeling anxious; an allopathic agent trial had been done and discontinued due to adversity;

    d)   Demonchaux confronted and denied any purging; she felt possibly dehydrated and was reluctant to drink.  (325).

106.    In addition, the following medical issues were noted: reflux symptoms, peripheral neuropathy, morning headaches, tension in her neck, abnormal laboratory results, and slightly distended abdomen; in response, medications were ordered and Demonchaux was referred for an abdominal CT scan.  (325).

107.    With respect to Demonchaux's issues with nutrition, weight and exercise, it was noted that she weighed 107.6 pounds and that she had successfully met her first weight goal and a new goal would be established.  (326).

108.   The weekly update form noted that Demonchaux reported "cutting corners" by restricting her food while portioning and the Center noted the following intervention in response:

"We need to begin allowing Dominique some independence in portioning and see what she will do however we are reluctant to do so when she is telling us she is restricting now while under observation." (326).

109.   Demonchaux also reported having urges to binge and purge in order to calm her anxiety and Dr. Emory prescribed Effexor XR and Valium to help decrease her anxiety.  (326).

110.   With respect to Demonchaux's behavior, it was noted that on August 7, 2009 she intentionally scratched herself with her fingernails and a hair clip and was very agitated and argued with the staff when the sharp object was taken away.  (327).

111.   It was noted that Demonchaux's self-harm incident was triggered because Dr. Schiffman performed an anal examination during the GI consultation without a nurse present and that the Center was assessing whether the incident was related to her medication.  (327).

112.   As a result of the self-harm incident, it was noted that Demonchaux signed another no-harm contract and was put on 24-hour observation and Dr. Emory was called to evaluate her.  (327).

113.   It was also noted that interventions were performed following her self-harm incident to help Demonchaux release and externalize her anger; after the interventions, Demonchaux reported feeling relief and that the interventions took away a lot of the frantic feelings she had of needing to self-harm.  (327).

114.   With respect to Demonchaux's discharge planning, it was noted that Demonchaux was extremely unhappy in her job and that she binged and purged throughout the workday.  (329).

115.   The weekly update noted that prior to being discharged, Demonchaux would be set up with a team in her area that specialized in working with women who had eating disorders.  (329).

116.   The weekly update also noted that the Center discussed different options for further treatment with Demonchaux.  (329).

### 4) **August 7, 2009 Client Incident Report**

117.    According to the Center's August 7, 2009 Client Incident Report, on August 7, 2009 at 3:30 p.m., Demonchaux used staples that had been taken from Dr. Schiffman's office to cut her right forearm.  (330).

118.    It was noted that the Center interrupted Demonchaux during her act of self-harm and advised her that she would be transported to the hospital if she could not refrain from self-harm.  (330).

119.    The Center did not send Demonchaux to the hospital for inpatient treatment or psychiatric care.  (330).

120.    The Center placed Demonchaux on 24-hour observation and bandaged her wound. (330).

121.    The Center also notified Dr. Emory's office of Demonchaux's self-harm because new medications had been administered the night before and in the morning.  (330).

122.    Demonchaux also signed an Official No Harm Contract on August 7, 2009.  (330).

123.    The Client Incident Report was signed by the Center's Clinical Director and Kelly McMichael, a witness.  (330).

### 5) **Dr. Schiffman's August 7, 2009 Outside Treatment Assessment Form**

124.    On August 7, 2009, Dr. Schiffman's assessment following his GI consultation of Demonchaux was that she had GERD and the remainder of his assessment is illegible.  (332).

125.    Dr. Schiffman recommended the following treatment: continue the fiber supplement and diet and add Dulcolax.  (332).

### 6) **August 4, 2009 CT Scans**

126.    On August 4, 2009, Demonchaux underwent a CT scan of the pelvis due to chronic pancreatitis, which revealed a large amount of stool in her colon and no other abnormalities.  (333-34).

### 7)  July/August 2009 Vitals Record

127.    Demonchaux's blood pressure and pulse were recorded daily from July 8, 2009 through August 13, 2009.  (336-37).

128.    No abnormalities were noted with respect to Demonchaux's vital signs.  (336-37).

### 8)  August 10, 2009 Weight Record

129.    Upon admission to the Center on June 29, 2009, Demonchaux was five (5) feet, five (5) inches tall and weighed 96 pounds, which was 76% of her ideal body weight.  (338).

130.    The Weight Record noted that Demonchaux's ideal body weight was 125 pounds, plus or minus 10% (which was 112.5-137.5 pounds).  (338).

131.    On August 3, 2009, Demonchaux met her first weight goal of gaining ten (10) pounds when she weighed 108 pounds.  (338).

132.    Demonchaux's second weight goal was to gain 5-7 more pounds.  (338).

133.    As of August 10, 2009, Demonchaux had gained 11.6 pounds since her admission and weighed 107.6 pounds.  (338).

### 9)  Clinical Progress Notes from August 7, 2009 through August 13, 2009

134.    On August 7, 2009, it was noted that Demonchaux feared talking to her boss and was worried that a negative response from him would affect "her chances for step-down."  (339).

135.    On August 8, 2009, it was noted that Demonchaux presented to her individual treatment session agitated and she explained feeling exhausted, possibly because of her medication.  (339).

136.    During the individual treatment session, Demonchaux was informed of ways to avoid self-harm.  (340).

137.    On August 9, 2009, it was noted that Demonchaux presented to her individual treatment session "in a somewhat better place than previous session."  (340).

138.    During the treatment session, Demonchaux was taught a technique on how to relieve her anger and she expressed her surprise at how relieved she felt and that the adrenaline rush was similar to her cutting.  (340-41).

139.    On August 10, 2009, it was noted that Demonchaux thought about "discharge because she is feeling hopeless because her mind is not changing."  (341).

140.    On August 11, 2009, it was noted that Demonchaux had been moved to full observation because of her self-harm and she would remain on full observation until deemed appropriate.  (342).

141.    It was also noted that Demonchaux was "just beginning to feel more alive than she has felt in a long time."  (343).

142.    On August 12, 2009, it was noted that Demonchaux "explained being ready to let go of anger from experience in the past, but unaware of how to go about it."  (344).

143.    It was also noted that Demonchaux "asked staff questions about advice for moving forward."  (344).

144.    On August 13, 2009, it was noted that Demonchaux was "crying saying that she wants to go home, hates all the rules [at the Center], and can't do this anymore.  [Demonchaux] got angry with peer and staff saying this is a waste of time and that she can't do this."  (345).

**10) Staff Communication Notes from August 6, 2009 through August 9, 2009**

145.    On August 6, 2009, it was noted that Demonchaux was doing "shop 'n cook."  (346).

146.    On August 7, 2009, it was noted that while Demonchaux was in the car driving to her GI appointment, she was very nervous and made scratches on her right elbow and arm.  (346).

147.    Later that day, an "All Staff Alert" was noted saying "Dominique used staples to cut her right forearm.  She is on 24-hour observations.  Please offer her ice if she comes to you and says she wants to hurt herself/others.  Dr. Emory has been alerted.  An incident report has been written.  Please stay with her closely!"  (346-47).

148.    On August 8, 2009, it was noted that Demonchaux seemed to be in a "better mood and more herself." (347).

### E. Hartford's Review and Decision on Administrative Appeal

149.    Oxford received the Center's expedited appeal letter on August 14, 2009 at 2:13 p.m. (179, 316-349).

150.    By letter dated August 14, 2009, Oxford advised Demonchaux that it had received the Center's expedited appeal of its decision to deny coverage for inpatient psychiatric care from August 10, 2009 forward. (291).

151.    On August 14, 2009, Oxford referred Demonchaux's file to Prest & Associates, which retained Dr. Robert N. Polsky to perform an independent clinical peer review of Demonchaux's case and provide an opinion concerning the medical necessity of further inpatient treatment. (311-12).

152.    Dr. Polsky, who is Board Certified in psychiatry and addiction medicine, was asked to perform an expedited psychiatric review, which was due within 72 hours or less. (311-12).

### 1) Dr. Polsky's Review Report

153.    On August 14, 2009, Dr. Polsky performed an independent clinical peer review of Oxford's determination that Demonchaux's inpatient treatment was not medically necessary by reviewing case notes of United Behavioral Health, Demonchaux's chart from the Center, and speaking with Dr. Schneider at 2:55 p.m. (313).

154.    Dr. Polsky noted that since Demonchaux was 15 years-old, she suffered from anorexia nervosa for which she received multiple treatments, several hospitalizations and had a long-standing history of superficial cutting. (313).

155.    Dr. Polsky also noted that Demonchaux weighed 95 pounds when she was admitted to the Center on June 29, 2009 and made "slow and steady progress" at the Center. (313-14).

156.    Dr. Polsky noted that on August 10, 2009, Demonchaux weighed 107.6 pounds, which was 86% of her ideal body weight.  (314).

157.    Dr. Polsky further noted that Demonchaux was diagnosed with Major Depression, but she was not suicidal or homicidal at that time and she had not been manic or psychotic.  (314).

158.    Dr. Polsky noted Dr. Schneider's concerns during their discussion to be the following:

> "[O]n a trip to a medical appointment from the [Center], she ended up doing some superficial cutting.  His treatment goals for the patient are that there will be no cutting and that she will be successfully able to portion her food essentially without giving it much thought."  (314).

159.    Dr. Polsky reviewed Demonchaux's case according to the United Behavioral Health criteria for continued inpatient stay and determined that Demonchaux did not meet four (4) of the criteria for continued stay as of August 10, 2009 and specifically noted the following:

> "The patient was not suicidal, homicidal, manic, or psychotic, and she has a long-standing history of engaging in self-injurious behavior, such as superficial cutting for decades.  She is biomedically stable and is at 86% of her ideal body weight.  At this point, the patient could be safety treated in an intensive outpatient eating disorder program setting."  (314).

160.    Dr. Polsky informed Dr. Schneider of his opinion that Demonchaux's inpatient treatment at the Center was no longer medically necessary as of August 10, 2009 and he referred Dr. Schneider back to Oxford for appeal options.  (314).

161.    On August 14, 2009 at 6:35 p.m., Oxford Medical Director, Dr. G. Wilder, performed a medical record review of Demonchaux's file on clinical appeal, which included Demonchaux's medical records and Dr. Polsky's report, and upheld the denial of further inpatient treatment at the Center as not medically necessary.  (179).

162.    By letter dated August 14, 2009, Oxford advised Demonchaux of its determination to uphold the initial adverse determination because medical necessity had not been demonstrated.  (301-310).

163.     Oxford's letter explained that it had considered all available information and the terms of the Plan and that even though Demonchaux had a long-standing history of engaging in self-injurious behavior, but she was not manic or psychotic and she was at 86% of her ideal weight.  (301).

164.     Oxford's letter advised Demonchaux that she could be "safely treated in an intensive outpatient eating disorder program setting."  (301).

165.     Oxford's letter further notified Demonchaux that she had two options for a second-level appeal: (1) file an application through the New York State External Appeal Process to have the decision reviewed by an independent utilization review organization, or (2) continue through the internal appeal process and file an appeal with the Oxford Grievance Review Board.  (302-03).

166.     Demonchaux was also advised by Oxford's letter that she had the right to file a civil action under section 502(a) of the Employee Retirement Income Security Act.  (304).

167.     On September 2, 2009, Demonchaux was discharged from the Center.  (181).

168.     In this action, Demonchaux seeks benefits for the additional days she stayed in the facility from August 9, 2009 through September 1, 2009, which amounts to approximately $29,000.00. (Complaint, ¶10).

Dated:  New York, New York
         September 1, 2011

Respectfully Submitted,

_s/_____
MICHAEL H. BERNSTEIN (MB 0579)
JOHN T. SEYBERT (JS 5014)
BETSY D. BAYDALA (BB 5165)
SEDGWICK LLP
125 Broad Street, 39th Floor
New York, New York 10004-2400
Telephone: (212) 422-0202
Facsimile:  (212) 422-0925
(SDMA File No. 3246-000087)
*Attorneys for Defendant*
Oxford Health Plans (NY), Inc.
s/h/a Unitedhealthcare Oxford

TO:
Scott M. Riemer (SR5005)
sriemer@riemerlawfirm.com
RIEMER & ASSOCIATES, LLC
60 East 42nd Street, Suite 1750
New York, NY 10165
Telephone: (212) 297-0700
Facsimile:  (212) 297-0730

Lisa S. Kantor, Esq. (State Bar No. 110678)
lkantor@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile:  (818) 350-6272

*Attorneys for Plaintiff*
*DOMINIQUE DEMONCHAUX*

## CERTIFICATE OF SERVICE

I, BETSY D. BAYDALA, hereby certify and affirm that a true and correct copy of the attached

**DEFENDANT'S RULE 56.1 STATEMENT** was served **via ECF and regular mail** on this 1st day

of September, 2011, upon the following:

Scott M. Riemer (SR5005)
sriemer@riemerlawfirm.com
RIEMER & ASSOCIATES, LLC
60 East 42nd Street, Suite 1750
New York, NY 10165
Telephone: (212) 297-0700
Facsimile: (212) 297-0730

Lisa S. Kantor, Esq. (State Bar No. 110678)
lkantor@kantorlaw.net
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
Facsimile: (818) 350-6272

*Attorneys for Plaintiff*
*DOMINIQUE DEMONCHAUX*

Dated:      New York, New York
            September 1, 2011

            _s/_____
            BETSY D. BAYDALA (BB 5165)